IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 21, 2025 Session

## IN RE ESTATE OF RUBY SMITH

**Appeal from the Probate Court for Davidson County**
**No. 20P1413 Clifton David Briley, Judge**
_____

**No. M2024-01256-COA-R3-CV**
_____

This appeal arises from the sale of certain real property by a custodian for the benefit of two minor children pursuant to the Tennessee Uniform Transfers to Minors Act. The custodian sold the property without having it appraised, hiring a real estate agent, or listing the property for sale on the open market. Rather, the custodian reviewed an appraisal published by the county's property assessor and then sold the property for a price slightly exceeding the listed value. The children's mother filed a lawsuit on their behalf, alleging that the custodian breached his fiduciary duty of care. The trial court determined that the mother failed to prove that allegations and dismissed the case. The mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which KENNY W. ARMSTRONG and VALERIE L. SMITH, JJ., joined.

Radford H. Dimmick, Nashville, Tennessee, for the appellant, Morgan Miller.

Michael G. Hoskins, Nashville, Tennessee, for the appellee, James E. Wilson, Jr.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

This appeal arises from an alleged breach of the fiduciary duty of care owed by a custodian in the sale of certain real property pursuant to the Tennessee Uniform Transfers to Minors Act ("the UTMA"). While the litigation leading to this appeal is rather protracted, the underlying facts are largely undisputed.

Ms. Ruby Jean Battle Smith ("Decedent") died on August 12, 2020. At the time of her death, Decedent owned a home located at 3952 Drakes Branch Road, Nashville, Tennessee ("the Property"). Initially, the Property was transferred to Decedent's two adult daughters.[1] However, a holographic Last Will and Testament ("the Will") executed by Decedent was subsequently discovered. The will contained the following paragraph:

> My grandson, James E. Wilson, Jr. will act as custodian over the sale of my residence at 3952 Drakes Branch Road, Nashville, Tennessee 37218. He is to receive $2000.00 for managing the sale of the house and using the remaining money from the sale to see that my great granddaughters Normandy Miller and Madison Brown's needs are taken care of when it becomes necessary or feasible according to his judgment. Once Normandy becomes twenty-one years [sic] she is to receive half of any of the money that might still be in existence. James will continue to manage Madison's half of the money until she is twenty-one if any money remains, [sic] Once Madison is twenty-one she is to receive all of the money that might remain.

The will was subsequently admitted to probate, and Ms. Joy S. Kimbrough was named the personal representative of the estate.

On March 3, 2021, Mr. Wilson contacted Ms. Morgan Miller,[2] the mother of Normandy Miller and Madison Brown ("the children"), and informed her that he intended to have repairs performed at the Property to prepare it for sale. He explained that he anticipated the Property would be sold the next year. He also informed her that he planned for Ms. Moseley (his half-sister) to reside at the Property while the repairs were being carried out. On March 15, 2021, Ms. Miller filed a "Petition to Construe Will Clause" on behalf of the children in the Davidson County Probate Court. The petition sought an order requiring Mr. Wilson "to promptly sell [the Property]."[3] A hearing on the matter was set to take place on April 22, 2021. However, Mr. Wilson sold the Property to The Nikolas

---

[1] Shortly after Decedent's death, and prior to her will being discovered, a deed transferring title of the Property to Decedent's daughters was recorded in the office of the Register of Deeds for Davidson County. This deed is not in the record and was deemed void by order entered January 22, 2021. On February 4, 2021, the Property was transferred to Mr. Wilson as "Custodian for the benefit" of the children pursuant to the UTMA. *See* Tenn. Code Ann. § 35-7-106.

[2] For the remainder of this opinion, any reference to "Ms. Miller" will refer to Ms. Morgan Miller.

[3] The petition also sought a ruling that the will clause be construed as a nomination of a custodian and the conveyance of the Property "to have been done under the authority of [the UTMA]." Subsequently, the trial court ruled, and the parties agreed, that the transfer was made pursuant to the UTMA and Mr. Wilson was the custodian of the Property for the benefit of the children. The UTMA provides that "[a] transfer may be made only for one (1) minor" and "custodial property held under this chapter by the same custodian . . . for the benefit of the same minor constitutes a single custodianship." Tenn. Code Ann. § 35-7-111. The deed transferring the Property to Mr. Wilson as the custodian explicitly conveyed a one-half interest in the Property to each of the children. Therefore, two custodianships were created when the Property was transferred to Mr. Wilson. *See* Tenn. Code Ann. § 35-7-104(c).

Bean Jackson Trust ("the Jackson Trust") for $215,000 by Quitclaim Deed executed on April 15, 2021. Dr. Samuel Jackson, the trustee of the Jackson Trust, negotiated the sale and accepted the transfer on the trust's behalf.

On May 6, 2021, Ms. Miller filed a complaint for breach of fiduciary duty on behalf of the children against Mr. Wilson in his capacity as the custodian of the Property. The complaint alleged that Mr. Wilson breached the fiduciary duty of care he owed to the children by: (1) selling the Property for "less than the appraised value of the [P]roperty for the purposes of taxation and even lesser [sic] than the actual market value of the Property," (2) failing to hire a real estate agent to market the Property, (3) failing to list the Property for sale to the general public, and (4) failing to obtain a professional opinion of the Property's value prior to the sale. *See* Tenn. Code Ann. § 35-7-113(b). The complaint also named Dr. Jackson as a defendant, in his capacity as trustee of the Jackson Trust. Ms. Miller requested a monetary judgment against Mr. Wilson, that the deed be set aside, and an award of costs and attorneys' fees. Later, Ms. Miller filed an amended complaint that altered only the portions of the complaint pertaining to Dr. Jackson. The amended complaint alleged that Dr. Jackson was a personal friend of Ms. Kimbrough (Mr. Wilson's mother), and he "in bad faith had actual knowledge that the selling price of the Property was well below market value."

In his answer, Mr. Wilson admitted that he did not list the Property for sale to the general public and did not hire a real estate agent. However, he denied having sold the Property for less than its appraised value or fair market value. He also claimed that he sought a professional opinion of the Property's value prior to the sale. He later explained during a deposition that he had reviewed certain information published on the website of the Davidson County Assessor of Property ("the Assessor") prior to the sale. The Assessor's website displayed an "Unofficial Property Report Card" that featured a "Current Property Appraisal," which listed the Property's appraised value at $210,700.

Notably, much of the ensuing litigation pertained only to Dr. Jackson.[4] The trial court granted Dr. Jackson's motion for summary judgment by order entered May 14, 2024. The trial court determined that Dr. Jackson was a good faith purchaser for value, and as such, he had no legal obligation to the children. The dismissal of Dr. Jackson is not challenged on appeal. Mr. Wilson and Ms. Miller proceeded to trial on July 10, 2024. In his pretrial brief, Mr. Wilson claimed that, as he sold the Property for more than the Assessor's appraised value, he had not breached his fiduciary duty of care. Mr. Wilson argued that his reliance on the Assessor's appraisal was reasonable "pursuant to" Rule

---

[4] When this case was originally filed, it was before Judge Randall Kennedy. Though it is unclear from the record when, at some point, the case was transferred from Judge Kennedy to Judge Andra Hedrick. Judge Hedrick had previously served as Mr. Wilson's counsel in this matter but was permitted to withdraw as counsel on August 12, 2022. She was assigned the case and promptly recused herself on September 1, 2022. At that point, the case was assigned to Judge David Briley.

39.07 of the Davidson County Local Rules of Court ("Local Rule 39.07"), which he claimed, "provide[s] for the use of such assessments in the sale of real property."

To begin, both parties called expert witnesses to testify out of order and prior to any opening statements. Ms. Miller called Mr. Murray Huber to testify. Mr. Huber has worked as a residential real estate appraiser since 1979. In 2022, he performed an appraisal of the Property that was retroactive to its value as of April 15, 2021. A copy of the appraisal report was entered as an exhibit and listed an appraised value of $350,000. Mr. Huber based this appraisal on several factors, including a visual inspection of the Property, the sales of comparable homes, the date and time of the sale, and several other factors. The report also noted the appraisal was made based on the assumption that the overall condition of the Property was average at the time of sale. Mr. Huber later explained that if the Property's condition was below average "[i]t could impact the value." The comparable homes Mr. Huber relied on were three residential properties that sold in the years 2020 and 2021. The homes were located in the same area of Nashville as the Property. The report stated that the homes sold for $340,000, $250,000, and $280,000 respectively. Mr. Huber augmented these prices using certain factors to adjust for considerations such as lot size, amenities, date of sale, and age. The report listed the adjusted prices for these homes as $356,800, $338,500, and $358,800 respectively. These factors led him to appraise the value of the Property at $350,000 as of April 15, 2021.

Next, Mr. Wilson called Mr. Theodore Ensley Jr. to testify. Mr. Ensley has been a certified residential appraiser since 1999. He submitted an appraisal report, which provided that, in his opinion, the value of the Property as of April 15, 2021, was $250,000. Mr. Ensley explained that he and Mr. Huber used similar processes and techniques in generating their appraisals. Mr. Ensley considered several factors and relied on the analysis of the sales of comparable homes in the area. He even considered one of the same properties that Mr. Huber considered in his report. These properties sold for $225,000, $225,000, and $360,000 respectively.[5] Like Mr. Huber, Mr. Ensley augmented these sales prices using certain factors to account for things such as lot size, age, and square footage. As a result, the adjusted prices used for comparison were $248,000, $166,000, and $288,000 respectively. Notably, Mr. Ensley stated that his report did not contain any "time adjustments" for dates of sale. This appears to be one of the primary differences in Mr. Ensley's assessment of the Property's value and Mr. Huber's. Mr. Huber's report contained time adjustments that increased the adjusted sales price of each comparable home considered. Mr. Ensley stated that he did not "see a big need for time adjustments" in appraising the Property.

---

[5] Mr. Ensley and Mr. Huber both listed a property located at 4350 Setters Road as a comparable sale. However, the reports list different sales prices for the property. Mr. Huber's report listed the sales price at $250,000 whereas Mr. Ensley's report listed the sales price at $225,000. During his testimony, Mr. Huber acknowledged that he had mistakenly listed an incorrect price for this property. Nevertheless, he maintained that this error did not affect his opinion regarding the appraised value of the Property.

Next, the parties offered their opening statements, and Mr. Wilson was subsequently called to testify. To begin, Mr. Wilson was asked about his plans for the Property when he became the custodian. He explained that he had planned to have certain repairs performed at the Property prior to selling it. He stated that he intended to sell the Property after approximately one year, and in the meantime planned for Ms. Moseley to reside there. He also stated that he did not intend to charge Ms. Moseley rent to live at the Property, but he maintained that she would "take over the bills." He explained that he wanted Ms. Moseley to reside at the Property to prevent it from falling "into further disrepair." He informed Ms. Miller of this plan and indicated that she was initially receptive to the idea. However, shortly thereafter, he was served with the petition that sought to require him to sell the Property promptly. He then sold the Property to the Jackson Trust.

Mr. Wilson was next asked about the circumstances surrounding the sale of the Property. He stated that Ms. Moseley did not reside at the Property at the time of sale, but she did begin living there sometime after. He also admitted that he had drawn up the deed transferring the Property to the Jackson Trust. He used the information from the previous deed to do so, and had Ms. Moseley's half-brother notarize it.[6] He also explained that while Dr. Jackson was "an acquaintance of the family" he did not have a relationship with him. He acknowledged that he did not list the Property with a real estate agent, but claimed he avoided doing so in order to sell the Property "immediately in accordance with [Ms. Miller's] filing." He stated that he believed Ms. Miller filed the petition "because [the children] were needing money." He later reiterated that one of the primary reasons he did not hire a real estate agent was because of the "time crunch that [he] was placed under with" the Property due to the filing. He also claimed that he wanted to avoid the fees associated with hiring a real estate agent in order "to preserve as much of the funds as possible." Mr. Wilson stated that he had no training in the real estate business but claimed he did have some experience. He stated that, prior to the sale of the Property, he had sold two pieces of real property in Georgia. He noted that he had employed a realtor when selling those properties. He also acknowledged that he did not list the Property on the open market prior to selling it. However, Mr. Wilson claimed that he reviewed "[t]he tax appraisal site" to ascertain the value of the Property. Subsequently, Mr. Wilson was asked to review a new property appraisal taken from the Assessor's website that was dated April 30, 2021, approximately two weeks after the execution of the deed to the Jackson Trust. The updated appraisal listed the total appraised value of the Property as $357,500.

On cross-examination, Mr. Wilson explained that, prior to these events, he had a very close relationship with both the Decedent and the children. He claimed that when he became the custodian, he recognized the Property was in very poor condition. This led him to conclude that he needed to have repairs made so he "could sell it and get a good amount

---

[6] Ms. Moseley and Mr. Wilson are half-siblings sharing the same mother. Ms. Moseley and the notary are also half-siblings, but they share the same father. Mr. Wilson and the notary are not biologically related.

for it." He also explained that he asked Ms. Moseley to reside at the Property while it was being repaired so she could allow workers entry. He stated that she would have also been responsible for paying any bills associated with the Property.

Mr. Wilson then reviewed several photographs of the Property's interior that showed many issues such as cracked tiles, dilapidated wood, and water damage. He claimed that these issues left him worried the Property would not pass an inspection. He indicated that he made the sale to the Jackson Trust "[a]s-is." He also explained that he had received several "inquiries" about the Property prior to the sale. However, he claimed that these inquiries "were more speculative in nature" and came from parties attempting to purchase properties at very low prices. None of the inquiries offered a price of more than $200,000. One offer was as low as approximately $90,000.

Ms. Miller was the final witness called to testify. She stated that she did not have an issue when Mr. Wilson was initially named custodian of the Property. However, she became alarmed when he informed her that he intended to wait approximately one year to sell the Property. She was also concerned with Mr. Wilson's plan to permit Ms. Moseley to reside at the Property in the interim. She stated that she did not believe it was prudent for anyone to "live in the house if you're going to sell it, go ahead and sell it, get it sold, because what if the house burns down . . . it gets damaged." She also claimed that she was not attempting to force Mr. Wilson to sell the Property immediately when she filed her original petition. Rather, she wished for it to be sold "[p]romptly" but also wanted it to be sold for the highest price possible. Moreover, she stated that Mr. Wilson did not contact her for approval prior to the sale. She claimed that if she had known the price beforehand, she would have "negotiated."

On cross-examination, Ms. Miller was asked whether she initially believed that Mr. Wilson's plan was a "good idea," to which she responded, "[y]es." She explained that she changed her mind after speaking to her mother, who raised some concerns with the plan. However, she did not share those concerns with Mr. Wilson because "[h]e had already made his mind up." She claimed that she merely "wanted to make sure that [the sale] was taken care of promptly, in the right way" but acknowledged Mr. Wilson had not done anything wrong by forming this plan. Rather, she claimed that she "didn't want anything to go wrong" and hired an attorney as a "preventive method." This concluded the testimony.

Subsequently, Mr. Wilson's counsel made a "motion to dismiss the case and for a verdict for the defendant." Counsel asserted that Ms. Miller had not proven Mr. Wilson breached his fiduciary duty. Counsel pointed specifically to the fact that Mr. Wilson reviewed the Assessor's appraised value of the Property and then sold it for more than the amount listed. This led to a discussion of Local Rule 39.07. Local Rule 39.07 requires fiduciaries holding real property for the benefit of another in Davidson County to submit a proposed contract for the sale of the real property for court approval prior to execution.

The fiduciary is also required to attach to the motion "a report of the assessed value of the property by the County Assessor of Property." Mr. Wilson relied on Local Rule 39.07 as authorization to rely on the Assessor's appraised value when selling the Property. The trial court noted that Mr. Wilson was not required to file such a motion as the rule exempts those fiduciaries authorized to sell the subject property expressly in a will. The trial court also noted that these reports are submitted "as some sort of indicia for the Court to rely on" when taking up such motions. However, the trial court determined that "the rule [did not] really get as far as . . . ha[d] been argued." Counsel for Mr. Wilson agreed but maintained that Mr. Wilson acted reasonably when he considered the appraisal because "those are numbers that are used all the time in probate court." The trial court then stated that the existence of Local Rule 39.07 would weigh on its consideration of the Assessor's appraisal. The trial court opined that the appraisal was "evidence of reasonableness," which would weigh as "evidence on one side of the scale." However, the trial court noted that the Assessor's appraisal was not "dispositive." Accordingly, the trial court denied the motion to dismiss and stated that it would "weigh all of the evidence and reach a conclusion about whether or not Mr. Wilson acted reasonably in the sale of the [P]roperty at the specified amount." This concluded the trial.

The trial court entered an order memorializing its findings of fact and conclusions of law on July 18, 2024. The trial court determined that Mr. Wilson did owe the children a fiduciary duty when dealing with the Property, and "was obligated to act as a reasonably prudent person making decisions regarding the property of another." *See* Tenn. Code Ann. § 35-7-113(b). The trial court then weighed the facts and circumstances of the case to determine whether Mr. Wilson breached this duty when selling the Property.

Initially, the trial court determined that several facts indicated Mr. Wilson acted unreasonably when selling the Property. The trial court noted that the Assessor's appraisal Mr. Wilson relied on was several years old at the time of sale. The Assessor's appraisal also listed a significantly lower value than the updated appraisal published shortly after the sale. The trial court determined this was "significant evidence that Mr. Wilson acted unreasonably." Additionally, the trial court found the testimony of Mr. Huber to be "credible and well-reasoned" but noted that alone, it did not "demonstrate that Mr. Wilson acted unreasonably in selling the Property for less" than the report's appraised value. The trial court noted Mr. Wilson's lack of real estate experience or training and stated that "[t]hese facts should have made [him] consider the prudence of a sale that was not subjected to the review of an expert or more generally subjected to test of the open market." The trial court further stated that "[t]he sale of the Property to a family friend under these circumstances certainly created the appearance that something could be amiss."

However, the trial court also determined that several facts indicated Mr. Wilson had acted reasonably. First, the trial court determined that Ms. Miller's act of filing the petition prior to contacting Mr. Wilson informally "would have given the legitimate impression to Mr. Wilson that time was of the essence." The trial court also found that the testimony of

Mr. Ensley was as "equally credible and well-reasoned" as Mr. Huber's. Further, the trial court considered the applicability of Local Rule 39.07 and the Assessor's appraisal. The trial court stated that while Local Rule 39.07 did not "govern" the case, it did serve as evidence that "tend[ed] to prove that Mr. Wilson's reliance on the Assessor's appraisal was reasonable." Additionally, the trial court accepted as true Mr. Wilson's claim that he sold the Property quickly because he believed that the children needed the money that would be derived from the sale. The trial court also accepted as true his claims that he did not employ a real estate agent in order to sell the Property quickly and to avoid the fees associated with employing a real estate agent. Finally, the trial court accepted Mr. Wilson's testimony that he took the deteriorated condition of the Property and the Assessor's appraisal into account when negotiating a price.

Taking each of these facts into account, the trial court found that Ms. Miller had "not met her burden to prove by a preponderance of the evidence that Mr. Wilson acted without ordinary care, unreasonably and/or imprudently in the sale of the Property." Additionally, the trial court found that Mr. Wilson "did not act with an ulterior motive" and "that the price of the sale was unrelated to [Ms. Moseley's] ability to reside [at the Property] in the future." The trial court dismissed the claim with prejudice. Ms. Miller filed this appeal.[7]

## II. Issues Presented

The appellant has presented the following issues on appeal, which we have slightly restated:

1. Whether the trial court erred when it determined that Ms. Miller failed to prove Mr. Wilson breached his fiduciary duty of care.
2. Whether the trial court erred when it denied Ms. Miller's claim for attorneys' fees and costs.

For the following reasons, we affirm the judgment of the trial court.

---

[7] After the trial court entered its final order and prior to the filing of the notice of appeal, Mr. Wilson filed a "Motion for Fees" in which he sought an order permitting him to reimburse himself for travel expenses and attorney's fees incurred in this action. This motion was granted by order entered November 13, 2024. Mr. Wilson filed a motion to alter or amend the order awarding fees on November 26, 2024. The order sought an award of additional fees necessary to reimburse Mr. Wilson's previous attorney. The trial court entered an order on February 10, 2025, in which it granted the motion to amend the fee award, but declined to unfreeze any custodianship funds pending the outcome of this appeal. Notably, only the original motion for fees was included in the record on appeal. Due to concerns of finality of judgment, this Court entered a show cause order on August 13, 2025, requesting a demonstration as to why the order was final. Though the subsequent orders and motion to amend had already been filed at the trial court, rather than provide us with this information, counsel instead sought a ruling from the trial court confirming the judgment's finality. This was filed September 30, 2025.

## III. Discussion

### A. Standard of Review:

As this is a non-jury case, we will review any findings of fact "*de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *see In re Est. of Fletcher*, 538 S.W.3d 444, 448 (Tenn. 2017). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *In re Est. of Ladd*, 247 S.W.3d 628, 637 (Tenn. Ct. App. 2007) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). "However, our review of the court's legal conclusions is *de novo* with no presumption of correctness." *Harris for Richey v. Richey*, No. M2021-00331-COA-R3-CV, 2021 WL 6054819, at *4 (Tenn. Ct. App. Dec. 21, 2021) (citing *Est. of Fletcher*, 538 S.W.3d at 448). Additionally, "[t]he trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary." *Duke v. Duke*, 563 S.W.3d 885, 894 (Tenn. Ct. App. 2018) (citing *Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002)).

Ms. Miller asserts in her brief that the issue of whether Mr. Wilson breached his fiduciary duty is a question of law. However, in other contexts, we have previously held that "[t]he question of whether a fiduciary duty has been breached is a question of fact." *Dominion Enters. v. Dataium, LLC,* No. M2012-02385-COA-R3-CV, 2013 WL 6858266, at *4 (Tenn. Ct. App. Dec. 27, 2013) (citing *B & L Corp. v. Thomas & Thorngren, Inc.*, 162 S.W.3d 189, 205 (Tenn. Ct. App. 2004), *overruled by Fam. Tr. Servs. LLC v. Green Wise Homes LLC*, 693 S.W.3d 284 (Tenn. 2024)).

### B. Breach of Fiduciary Duty

Ms. Miller claims that the trial court erred when it determined that she failed to prove Mr. Wilson breached the fiduciary duty of care he owed to the children as custodian of the Property. She contends that Mr. Wilson breached his duty of care by: (1) selling the Property for "less than the appraised value of the [P]roperty for the purposes of taxation" and also for "less than [its] fair-market value," (2) relying on a four year old appraisal, (3) failing to hire a real estate agent, (4) failing to list the Property for sale to the general public, and (5) failing to obtain a professional opinion of the Property's value prior to the sale. Notably, many of the arguments that Ms. Miller made throughout the litigation below were predicated on the allegation that Mr. Wilson sold the Property to a family friend, in bad faith, and for the benefit of Ms. Moseley. However, no argument related to these claims has been preserved on appeal.

"In order to recover for a breach of fiduciary duty, 'a plaintiff must establish: (1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach.'" *In re Est. of McMillin*, No. E2020-00413-COA-R3-CV, 2021 WL 1235229, at *7 (Tenn. Ct. App. Apr. 1, 2021) (quoting *Mitchell v. Morris*, No. E2015-01353-COA-R3-CV, 2016 WL 890212, at *9 (Tenn. Ct. App. Mar. 9, 2016)). The trial court determined, and the parties agree, that Mr. Wilson owed the children a fiduciary duty when dealing with the Property pursuant to the terms of the UTMA. Tennessee Code Annotated section 35-7-113(b) is the portion of the UTMA that provides the standard of care applicable to a custodian. The statute provides that:

> [i]n dealing with custodial property, a custodian shall observe the standard of care that would be observed by a prudent person dealing with property of another and is not limited by any other statute restricting investments by fiduciaries. If a custodian has a special skill or expertise or is named custodian on the basis of representations of a special skill or expertise, the custodian shall use that skill or expertise.

Tenn. Code Ann. § 35-7-113(b). The present circumstances appear to raise an issue of first impression in this state. The case law pertaining to UTMA is sparse, and our review has revealed no Tennessee cases considering whether a custodian has breached his or her duty of care. However, there are various sources of authority available to assist with our analysis.

First, our Legislature has adopted the precise language provided by the model version of UTMA, and several of our sister states have also adopted this precise language in their versions of UTMA. *See* § 12. Care of Custodial Property., Unif. Transfers to Minors Act § 12; *see also* Colo. Rev. Stat. Ann. § 11-50-113(2); Kan. Stat. Ann. § 38-1713(b); Mich. Comp. Laws Ann. § 554.537(2); N.C. Gen. Stat. Ann. § 33A-12(b); 20 Pa. Stat. and Cons. Stat. Ann. § 5312(b). Our State Supreme Court has previously considered the interpretation of model statutes by other states when analyzing the Tennessee version of the statute. *Tenn. Farmers Mut. Ins. Co. v. DeBruce*, 586 S.W.3d 901, 905 (Tenn. 2019). However, the Court noted that these interpretations are not binding. *Id.*

Additionally, precedent concerning trust law provides some guidance. Notably, custodianships "technically are not trust entities." *State ex rel. Working v. Costa*, 216 S.W.3d 758, 775 (Tenn. Ct. App. 2006). However, the two concepts are similar as both involve fiduciaries managing property on behalf of a beneficiary. *See* Tenn. Code Ann. §§ 35-7-113, 35-15-804. A trustee owes a fiduciary duty of care to the trust beneficiary to act "with at least such care and skill as a person of ordinary prudence would exercise in dealing with his or her own property." *Branum v. Akins*, 978 S.W.2d 554, 557 (Tenn. Ct. App. 1998) (citing *Knox Cnty. v. Fourth & First Nat'l Bank,* 182 S.W.2d 980, 984 (Tenn. 1944); *Gibson Cnty. v. Fourth & First Nat'l Bank,* 96 S.W.2d 184, 192 (Tenn. Ct. App. 1936)).

Meanwhile, the standard of care governing a UTMA custodian is stricter than that governing a trustee. *See Belk ex rel. Belk v. Belk*, 728 S.E.2d 356, 370 (N.C. Ct. App. 2012) (explaining that the standard of care for a custodian managing property pursuant to the UTMA is slightly stricter than that of a trustee). A custodian is required to act as "a prudent person dealing with property of another" rather than a person dealing with his or her own property. Tenn. Code Ann. § 35-7-113(b).

Typically, when reviewing a trial court's decision regarding whether a fiduciary has breached his or her duty of care, we review the record to assess whether the fiduciary's actions conformed with the duty of care owed. *See Rock Ivy Holding, LLC v. RC Props., LLC*, 464 S.W.3d 623, 642 (Tenn. Ct. App. 2014) (considering the actions of a company president and treasurer to determine whether there was "credible evidence in [the] record to support a finding" that they had breached their statutory duties of care in the sale of land for below market value). All the facts and circumstances present in a case must be analyzed when considering whether a fiduciary has breached his or her duty of care. *Alexander v. Nelson*, 825 S.W.2d 106, 108 (Tenn. Ct. App. 1991) (cautioning against considering only whether a trustee has sold property for less than its fair market value when determining whether the trustee has breached his or her fiduciary duty because "[t]he circumstances in each case must be considered"). *Id.* Our sister states have reviewed alleged breaches of fiduciary duties of care by custodians pursuant to their versions of the UTMA using the same analysis. *See Werner v. Werner*, 149 A.3d 338, 342-43 (Pa. Super. Ct. 2016) (assessing whether a custodian who had withdrawn UTMA funds to purchase a home in her own name had breached her fiduciary duty of care); *In re Alessandrini*, 769 S.E.2d 214, 217-18 (N.C. Ct. App. 2015) (upholding a grant of summary judgment where "the evidence before the trial court fail[ed] to show respondent acted dishonestly or unreasonably as custodian in managing and dispersing the funds in the UTMA accounts, or otherwise breached his fiduciary duty"). We will undertake the same form of review here to determine whether the evidence in the record preponderates against the trial court's determination that Ms. Miller failed to prove Mr. Wilson breached his duty of care.

We first consider Ms. Miller's claim that Mr. Wilson sold the Property for "less than fair market value." We have previously considered a similar set of factual circumstances in the context of trust law. *Branum*, 978 S.W.2d at 556. In *Branum*, we determined that a mother acting as trustee for the benefit of her daughter breached her fiduciary duty of care when she sold trust property worth "substantially more than the benefit received by [the daughter] as a result of [its] sale." *Id.* at 557. However, even when considering the stricter standard of care owed by a custodian pursuant to the UTMA, the decision in *Branum* is distinguishable from the present circumstances.

In *Branum*, we determined that the evidence submitted regarding the value of the subject property established its value at approximately $64,000. *Id.* Therefore, we were able to clearly determine that the beneficiary, who had only received a $29,000 discharge of indebtedness, received a benefit that was worth substantially less than the value of the

subject property. *Id.* Accordingly, we determined the record supported a finding that the mother had breached her fiduciary duty of care. *Id.* at 558. However, we also considered several additional factors when coming to this conclusion. *Id.* at 557. We noted that there was "no evidence to indicate that [the mother] made any effort, prior to the conveyance, to ascertain the fair market value of the property." *Id.* at 557. Conversely, the evidence did indicate that the mother failed to seek potential buyers from outside of her family based on "a strong desire to keep the subject property in the family." *Id.* Moreover, we determined that there were no circumstances creating a deadline for the sale of the property, as no foreclosure proceedings had been instituted. *Id.* Each of these circumstances lent support to the finding that the mother had breached her fiduciary duty of care in selling the subject property. *Id.* The present circumstances are less clear.

First, the parties submitted competing proof regarding the Property's value. Ms. Miller called an expert witness who testified that, in his opinion, the Property was worth $350,000 at the time of the sale. He also provided an appraisal report to explain his valuation. This evidence was countered by the report and testimony of Mr. Wilson's expert indicating that, in his opinion, the Property had a fair market value of $250,000 at the time of the sale. The trial court did not make a specific finding regarding the Property's fair market value, but rather, it gave the testimony equal weight. As a result of the competing evidence, the trial court determined that Ms. Miller had not proven her claim by a preponderance of the evidence. On appeal, Ms. Miller has not pointed to any evidence preponderating against this decision. She merely asks that we give more weight to her expert's appraisal. She has not explained why Mr. Huber's opinion deserved more weight than Mr. Ensley's or pointed to any additional evidence giving her expert's opinion greater evidentiary value.

Additionally, many of the other factors relied on by the *Branum* court are not present in this case. Where the *Branum* court determined that there were no circumstances creating a deadline for the sale, here, the trial court determined the filing of Ms. Miller's initial petition gave Mr. Wilson "the legitimate impression . . . that time was of the essence." The trial court accepted as true Mr. Wilson's testimony that he sold the Property without a real estate agent in order to sell it quickly and to avoid fees because "he was under the impression that [Ms. Miller] and [the children] needed the money from the Property soon[.]" Ms. Miller has not challenged these findings on appeal. Similarly, while the mother in *Branum* was determined to have limited the extent of her "investigation regarding potential buyers outside the family" because she "had a strong desire to keep the subject property in the family," the trial court determined that Mr. Wilson did not act with the ulterior motive of benefitting Ms. Moseley when he sold the Property. *Id.* Further, Mr. Wilson testified that the Property's "deteriorated condition" affected his strategy in selling it. The trial court accepted this claim as true. Ms. Miller has also failed to challenge these factual findings on appeal. Therefore, many of the additional circumstances which supported our finding in *Branum* that the mother had breached her fiduciary duty of care are not present in this case.

- 12 -

Next, we consider Ms. Miller's claim that Mr. Wilson breached his fiduciary duty of care when he sold the Property for less than its "appraised value . . . for the purposes of taxation." This claim appears to refer to the updated appraisal published on the Assessor's website shortly after the Property was sold. The trial court noted the existence of this updated appraisal in its final order and stated that it was "significant evidence that Mr. Wilson acted unreasonably." Despite this, the trial court still determined that the countervailing evidence indicated Ms. Miller failed to prove Mr. Wilson breached his fiduciary duty. Ms. Miller has not explained in her brief how the trial court erred in this determination or in weighing the evidence. It is not our role to formulate an argument for her. *See Sneed v. Bd. of Pro. Resp. of Supreme Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010).

Ms. Miller also claims that Mr. Wilson breached his duty of care by failing to hire a real estate agent and by failing to list the Property for sale on the open market. Notably, the trial court gave weight to these facts when assessing the evidence. The trial court stated that Mr. Wilson's limited experience with real estate "should have made [him] consider the prudence of a sale that was not subjected to the review of an expert or more generally subjected to the test of the open market." However, the trial court determined that these facts were "countered" by those facts tending to prove he acted reasonably. The trial court found that Mr. Wilson was under the impression "that time was of the essence," which led him to sell "the Property as quickly as he could." The trial court determined that Mr. Wilson refrained from hiring a real estate agent so that he could "sell the Property quicker and save money on the sale." Additionally, Mr. Wilson testified that he was concerned the Property would not pass an inspection and that he made the sale "[a]s-is." The trial court accepted as true Mr. Wilson's testimony that he considered the deteriorated condition of the Property when negotiating the sale. Ms. Miller has not challenged these factual findings. Further, Ms. Miller has again failed to explain how the trial court erred when it weighed this evidence and has also failed to identify any evidence in the record preponderating against it.

Lastly, Ms. Miller claims that Mr. Wilson breached his fiduciary duty of care by failing to obtain a professional opinion of the Property's value prior to the sale. Notably, Ms. Miller does not raise any issue with the trial court's application of Local Rule 39.07. Rather, Ms. Miller supports her contention only by reciting the portion of the trial court's order addressing the issue, followed by a single sentence stating that the ruling was contradictory to this Court's holding that assessed value is not direct evidence of the fair market value of real property. *See Carpenter v. Sims*, No. E2007-0622-COA-R3-CV, 2007 WL 4963008, at *4 (Tenn. Ct. App. Nov. 7, 2007). However, the trial court did not rely on the appraisal to establish the Property's fair market value. The trial court never made a finding regarding the Property's fair market value. Rather, the trial court stated that, "the Probate Court's general practice of reliance on the Assessor's most recent appraisal tend[ed] to prove that Mr. Wilson's reliance on the Assessor's appraisal was reasonable." *See Alexander*, 825 S.W.2d at 108 (stating that, "[t]he circumstances in each case must be

considered"). Thus, Ms. Miller's challenge does not actually address the purpose for which the trial court considered the Assessor's appraisal. Moreover, Ms. Miller has not explained why "[f]ailing to obtain any professional opinions for the value of the Property" constitutes a breach of fiduciary duty in the circumstances of this particular case. Again, it is not our role to formulate the appropriate argument for her. *See Sneed*, 301 S.W.3d at 615. Accordingly, she has waived any issue regarding consideration of the Assessor's appraisal.

Ms. Miller has not identified any evidence contained in the record preponderating against the trial court's determination that she failed to establish Mr. Wilson's conduct constituted a breach of his fiduciary duty. She has similarly failed to explain what evidence was improperly weighed by the trial court and has not disputed any of the facts the trial court relied on when weighing the evidence. Therefore, we affirm.

## C. Attorneys' Fees

Ms. Miller also claims that the trial court erred when it did not award her attorneys' fees. However, because her claims on the substantive issues of this appeal were unsuccessful, we also affirm the trial court's decision that both parties would "bear their own attorney's fees."

## IV. Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are taxed to the appellant, Morgan Miller, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE